Cranch, C. J.,
delivered the opinion of the Court.
Several free-born negroes and mulattoes are offered as witnesses to support the prosecution. The counsel for the traverser have objected, and contend that they are not competent witnesses, being disqualified by the Act of Assembly of Maryland, (1717, c. 13,) by which it is enacted “ That no negro or mulatto slave, free negro, or mulatto born of a white woman, during his time of servitude by law, or any Indian slave, or free Indian, native' of *518 this or the neighboring provinces, be admitted and received as good and valid evidence in law, in any matter or thing whatsoever; depending before any court of record, wherein any Christian white person is concerned.” It is contended that the words “ during his time of servitude by law,” are applicable only to the “ mulatto born of a white woman,” and not to the “free negro.” So that a free negro, whether under an obligation of servitude or not, is wholly incapacitated to become a witness in any case wherein a Christian white person is concerned. On the other side it is contended that the free negro, at all times except “ during his time of servitude by law,” is a competent witness in such a case.
In order to support the traverser’s construction of the statute, much reliance is placed on the word ‘>? his.” . It is said that if the legislature meant to apply the expression respecting servitude by law, to the free negro as well as to the mulatto, they would have said “ during their time of'servitude by law.” The word “ his,” it is said, in grammatical construction, must apply to the last person antecedent, namely, the mulatto, and cannot' comprehend both the mulatto and the free negro.
This construction, it is also said, derives support from the third section of the act, in which it is provided that “ where other sufficient evidence is wanting against any negro or mulatto slaves, free negro, or mulatto born of a white woman, during their servitude by law, the testimony of any negro or mulatto slave, free negro, mulatto born of a white woman, or Indian,” &c., “may be received as evidence, provided it do not extend to the depriving them, or any of them, of life or member.” It is said that the legislature having used the pronoun in the plural number in the third section, and in the singular in the second, it is evident, they meant in the one case to refer only to the mulatto, and in the other to both mulatto and free negro.'
It was also said to be an absurdity in terms, to speak of the time of servitude of a free negro. , That the expression, “ during his time of servitude by law,” was peculiarly applicable to the mulatto born of a white woman, because such mulatto, by the act 1715, c. 44, § 27, was declared to be a servant until the age of thirty-one years; but that the expression was not. applicable to the free negro, because there was no servitude by law imposed upon him.
• The argument drawn from the circumstance that the pronoun personal is usedin the singular number, is not considered of much weight, because the words “free negro” and- “ mulatto,” are joined by the conjunction disjunctive “ or ” ; and in such case the idiom of the English language admits the use of the singular pro *519 noun as applicable to each member of the sentence so joined. In such a sentence, the word his may have the same force and effect, as the word their; and it is evident that in this very act, the legislature have used the words indiscriminately to the same effect.
If the words of a statute be doubtful, and if recourse be had to construction, the first inquiry is, what was the evil which the legislature intended to remedy ? In the present case, we are not left to conjecture upon that point; for the legislature in the preamble to the statute have expressly declared the evil for which they contemplated a remedy. They say, “ Whereas it may be of very dangerous consequence to admit and allow as evidences in law, in any of the courts of record,” “ any negro, or mulatto slave, or free negro, or mulatto born of a white woman, during their servitude, appointed by law, or any Indian,” &c. The evil complained of, is not the admission of free negroes and mulattoes as witnesses generally, and in all circumstances, but only “ during their servitude, appointed by law.” Here the meaning of the legislature cannot be misunderstood; the words their servitude must mean the servitude of the free negro, as well as that of the mulatto ; they cannot be confined to the case of the mulatto, without charging the legislature with the grossest grammatical blunder. It is evident that the legislature contemplated some case in which a free negro could be subject to servitude by law; and by turning to the act of 1715, c. 44, (the same act which declares the mulatto born of a white woman to be subject to servitude,) we find a number of cases in which a free negro may be subjected to servitude by law. Thus in seel. 4, a free negro harboring a servant, or slave, forfeits one thousand pounds of tobacco, and if unable to pay, he is to make satisfaction by servitude. By sect. 6, a free person, taken up on suspicion of being a runaway, and unable to pay the reward of two hundred pounds of tobacco, shall make satisfaction by servitude. By sect. 7, a runaway, if not a slave, is to reimburse the county by servitude. By sect. 19, a runaway shall satisfy the reward by service, when free. By sect. 20, if such person be free and unable to pay the reward, he may be committed to prison until be. give security, or make satisfaction by servitude or otherwise. By sect.- 27, a free negro, the begetter of a child on a white woman, shall become a servant for seven years. By sect. 30, a free man, the father of a bastard begotten of a female servant, shall satisfy the damage by servitude or otherwise. So by the act of 1715, e. 26, § 2. A free person convicted of stealing, shall pay fourfold, and if unable to pay, shall satisfy by servitude. And by sect. 7, the fees of criminals may be paid by servitude.
These are some of the cases in which by the laws prior to 1717, *520 a free negro might be subjected to temporary servitude by law. They are enough to show that the expression, “ during his time of servitude by law,” might with as much propriety be applied to the free negro as to the mulatto, and that his ease was within the same reason. Why should the legislature limit the disability of the mulatto to his time of servitude, and not that of the free negro also ? or why permit a free-born mulatto to be a witness, and reject the free-born negro ? We can see no reason for such a whimsical distinction, and the legislature cannot be presumed to have had an intention to make it, unless such intention be very clearly expressed.
The legislature, when in the third section they say “ free negro, or mulatto born of a white woman, during their servitude by law,” evidently mean the same thing as they had before expressed by the same words in the preamble, and by the words “ free negro, or mulatto born of a white woman, during his time of servitude by law,” in the second section. It was argued that by the third section, the legislature meant to exclude free negroes, as witnesses even on the trial of a slave, in cases which might affect his life or member, and a fortiori, on the trial of a Christian white person.
■ By this section, slaves and free negroes and mulattoes, under all circumstances, that is, as well during their time of servitude by law, as otherwise, are admissible witnesses on the trial of a slave, in a case not affecting life or member. But how can it follow from thence, that on the trial of a slave in a case affecting life or member, a free negro or mulatto, not under servitude, would be excluded ?
■ Before the act of 1717, there was no law which excluded free negroes from being witnesses; that act only imposes a disability upon them during their servitude by law. It was the condition of servitude that the legislature justly supposed ought to render them incompetent witnesses; for the same reason that slaves are incompetent. It was probably supposed that while under the control of a master, they might by means of fear or threats of ill treatment* or actual ill treatment, be induced to conceal the truth, and that it was not safe to trust to their testimony. That reason could justify their exclusion only while their state of servitude continued.
This construction of the act seems to have been adopted by the legislature in 1796, c. 67, § 5, when they declared that no manumitted slave should be entitled to give evidence against any white person; for if all free negroes were already excluded by law, such a provision respecting those who were free by manumission, Was unnecessary.
*521 For these reasons, I am clearly-of opinion, that free-born negroes, not in a state of servitude by law, are competent witnesses in all cases, or rather that color alone does not disqualify a witness in any ease. At the time of the argument, I supposed the question had been decided by this court. But upon a careful examination of my, own notes, and those of the late chief judge, I do not find any such ease.
In the case of the United States v. Barton, a free mulatto, in Washington, July term, 1803, [ante, 132,] two manumitted ne-groes were admitted as witnesses against him, on an indictment for stealing.
In the case of United States v. Nancy Swann, [ante, 148,] (a free mulatto,) a summons for a slave to testify for the defendant, was refused by the Court; the Court being inclined to the opinion that the slave was not a competent witness. But in United States v. Shorter, a free black, at December term, 1806, [ante, 371,] a slave was admitted as a witness for the traverser. These are all the cases respecting the admission of people of color as witnesses, of which I can find any notes. But see the case of United States v. Fisher, at July term, 1805, [ante, 244.] Fisher, a white man, was indicted for beating his wife. Lucy Butler, a free-born black woman, was admitted by the Court as a witness against him.
Note. The Court was full when the question was argued, but when this opinion was delivered, Duckett, J., was absent, and Fitzhugh, J., having some doubt, it was agreed to hear a motion for a new trial, upon the ground of admitting improper evidence. The verdict being against the defendant, the question was further considered upon the motion for a new trial in this case, and iri that of Susan Davis v. Swann, at this term, when the other judges gave their full assent to the above opinion.[1]

 The following is written by Judge Pitzhugh, in his note-boot, in p. 84. After stating the opinion in this cause at length, as above,—
“ The Court intimated that they would hear a motion for a new trial — on the argument of which A. B. X). attended, and the Court were unanimously satisfied with the opinion expressed in this cause.”